Madam Clerk, would you please call the case for argument? The following case is scheduled for oral argument this morning, April 11, 2024, Case No. 23-2681 from Eastern Arkansas, Dylan Brandt et al. v. Tim Griffin et al. All right, Mr. Jacobs, we'll hear from you first. Good morning, Your Honors, and may it please the Court. This case is about whether the Constitution compels states to allow life-altering gender transition procedures to be performed on minors. Two courts of appeals analyzing the same claims at issue here have held that it does not. Instead, laws regulating gender transition procedures are subject only to rational basis review and easily survive it. This Court should overrule the prior panel decision in this case because it wrongly applied intermediate scrutiny to laws like Arkansas'. Instead, this Court should follow the reasoning of the Sixth and Eleventh Circuit and hold that Arkansas' law does not discriminate based on sex, it does not discriminate based on transgender status, and it does not run afoul of any parental rights secured by the Constitution. We ask that the decision below be reversed, and at this time, I'd welcome the Court's questions. I'd like to begin with a point that's come up in the briefs quite a lot, and that is on the sex classification point, what ought this Court, if anything, to do about the Supreme Court's decision in Bostock? And I think that the decision in Bostock is not particularly relevant for the Court here for at least three reasons. The first of those is that Bostock does not purport to say anything beyond the Title VII context and what it means for an employer's decision in the workplace to classify, or excuse me, to discriminate because of sex under Title VII. It does not purport, and even disclaims, to say anything about how the Equal Protection Clause, which is a very distinct text, ought to be interpreted. In other words, it's not on all fours with this case. And the second is that we do have Supreme Court precedent that is on all fours with this case. Godoldick and Dobbs both involve the issue of when a medical regulation classifies based on sex under the Equal Protection Clause. And so we submit that if there's any doubt to the Court whether the Court ought to follow Dobbs and Godoldick or follow Bostock, it ought to do what it does in any such case where there are two competing lines of Supreme Court precedent and it has to choose which standard to apply. It picks the line of Supreme Court precedent that most closely matches the case before it. And we would submit that this case, which involves the issue of when a medical regulation classifies based on sex under the Equal Protection Clause, and that is the reason that Dobbs and Godoldick's standard of when that classification occurs and does not occur controls here. Third, we think that even if the Court were to apply something akin to Bostock's but for causation analysis of when a law classifies based on sex, that the statute here would still not be subject to intermediate scrutiny. And that is because the SAFE Act does not discriminate based on a minor's sex. Rather, it discriminates based on, first, the age of the person seeking a gender transition procedure, and second, the effect and the purpose of the procedure itself. Indeed, the minor's sex is not a but-for cause in any sense of whether any procedure is available to that minor under the SAFE Act. Counsel, doesn't a doctor have to know what the biological sex is of the minor before they can decide whether or not they can prescribe a certain treatment? So, Your Honor, in some sense, the answer to that is yes, from the perspective of the doctor knowing what treatment ought to be provided and available in his medical judgment. However, for purposes of the Act, the doctor does not need to know a minor's sex to determine whether the Act, the SAFE Act, restricts a doctor's decision to prescribe a given drug to a given minor. And if I could use the example of testosterone, for example, because that's been fairly replete in the briefs before this Court. If a minor female shows up at an endocrinologist's office requesting testosterone, the doctor sees the patient and is aware that this minor is a female. The doctor doesn't have all the information that he needs to know to ascertain whether the SAFE Act prohibits him from prescribing testosterone to that female because he still needs to know whether testosterone is being sought as a part of gender transition. But isn't that part of the justification and not the initial classification? So, under Dobbs and Geduldig, the answer, I think, is no, Your Honor, in the sense that where there are procedures that, by their nature, only apply to one sex, which is true of every gender transition procedure before this Court, aside from puberty blockers, which I can separately explain, that where a statute is regulating a procedure that, in itself, is sex-based, that does not involve a sex classification. And I think that's clear from the way the statute operates. A minor seeking testosterone may be prescribed testosterone for any purpose other than gender transition under the statute. Now, as it happens... Could a minor girl, biological girl, get testosterone for a reason other than gender transition? The statute does not prohibit that. Now... So then it's sort of conflating the end goal with the procedure, with the treatment. So I think the legislature drew the distinction that it drew here because it was addressing the problem of gender transition. And it's not... The legislature wasn't presented with problems associated with the prescription of testosterone to female minors for other reasons. And it may, indeed, be the case that there are few, if any, reasons that a provider would ever prescribe testosterone to a female. But the Act is only concerned with one of those reasons. If it happens that a female minor comes in with some sort of hormonal deficiency that her physician thinks could be addressed by prescription of testosterone, the Act allows that. The Act allows... Or the Act takes no position, rather, on if a doctor would have prescribed testosterone to a female for other reasons such as sports performance. Now, the doctor's medical ethics would almost certainly prevent him from prescribing testosterone for that reason. But in terms of the statute's operation, it has nothing to do with it. Well, why doesn't that just go to whether it's substantially connected to an important governmental interest rather than whether or not it's actually a sex classification? It seems that you can put those justifications forth in the legal analysis. But it seems a little early in the analysis. So I think it goes to both. But I think following the logic of Godoldig and Dobbs, whether the medical procedure that is being regulated is sex-specific is the beginning and here the end of the analysis in terms of whether it draws a sex classification. The 6th and 11th circuits have both analyzed this claim and found that to be true here. And we think it resolves both sides of the equal protection issue, both in terms of the sex classification and the transgender status classification. Because I don't think there's anything special about sex or transgender status or anything else when it comes to the logic of Dobbs and Godoldig. It's simply an observation about what it means to classify under the equal protection clause. Because that at bottom is what the equal protection clause is concerned with. The state's classification, not the other aspects of the law. In turning to this question of whether the statute discriminates based on transgender status, I think that it's relevant to look at that claim in light of the question of whether transgender status is a suspect class. And we think the logic of the plaintiff's claim that the law does discriminate based on transgender status shows why that cannot be a suspect classification under the equal protection precedent of the Supreme Court. Because the district court's holding that the law discriminates based on transgender status was based on its determination that only transgender individuals seek gender transition procedures. But the district court also acknowledged, and plaintiffs don't dispute, that detransitioners exist. We had two detransitioners testify below. And these individuals often go through gender transition procedures at one point in their life. And later come to identify with their biological sex. And come to regret the fact that they had these procedures. Now, the district court, under the district court's logic, these individuals, at the time that they got gender transition procedures, were in fact transgender. Otherwise, the district court's finding that only transgender people received these procedures doesn't make sense. But the district court also acknowledged that these detransitioners are not transgender. And so, we think that shows why the transgender status is not an immutable characteristic for purposes of the Supreme Court's test in the link to determine whether to recognize a quasi-suspect class. We also think it shows why the law doesn't discriminate based on transgender status either. We think even if the district court was correct in its conclusion that only transgender individuals receive or seek gender transition procedures, the logic of Dobbs and Godoldig still follows. If a law classifies, if a law prohibits a medical procedure that only one specific classification of individuals can undergo, transgender status, for example, then it simply does not classify based on that characteristic. At this point, I can move, I guess, to the heightened scrutiny point and how the district court erred in applying what heightened scrutiny is supposed to look like in sex discrimination cases. The district court imposed a burden of proof and a standard of review on a state that you will find nowhere in the Supreme Court's sex discrimination precedence. The district court had the view that the state was required to show, in its words, that the risks of gender transition procedures on minors substantially outweigh their benefits in order to prevail on heightened scrutiny. And this weighing of risks and benefits in this substantially outweigh standard is not something that the court will find anywhere in the Supreme Court's equal protection case law. In fact, the only place that the Supreme Court's precedence show any resemblance to this is in the now overruled abortion precedent and the undue burden test announced in Casey. And so instead, laws that classify, and I want to be clear, we don't think the law classifies based on sex, but laws that do have a sex classification that is based on biological, enduring biological traits of males and females, rather than social norms or normative judgments about the relative roles of men and women, pass intermediate scrutiny so long as they are, they bear a substantial relationship to the objective. And we think that that. And here the district court found that it did not, correct? The district court did not. There was a broad range of facts that you're not contesting. As I understand, you presented this as a question of law. And so the district court's findings that showed that, well, you know, the number of the facts that showed that this was the only care for a certain number of people and that, as you know, the risks did not outweigh the benefits, that series of facts are still before us, correct, and unchallenged? So we, you're correct, Your Honor, that we don't challenge any of the factual findings that the district court made here. And we think that the key findings that the district court made confirmed what the legislature was concerned about, that these gender transition procedures pose certain risks, most prominently sterilization, a risk that is unique to the use of these medications, the district court said. And second, that there are no randomized controlled trials that could establish a causal relationship to any mental health benefits. And the district court, I guess I'm trying to get at what your objection is here because the district court did address those very concerns. And are you saying that the way the district court addressed those was erroneous? Certainly. We think that the district court's approach of taking it upon itself to weigh the medical evidence was not a proper application of intermediate scrutiny. And I think the clearest example of what intermediate scrutiny is supposed to look like in the context of a regulation that includes a sex classification that is based on an enduring biological difference between males and females. That case is Michelin versus Superior Court. And that case involved a sex classification and a statutory rape law that only imposed criminal liability on males. And the justification for that law was reducing teenage pregnancy. The state of California argued that females were sufficiently disincentivized to participate in sex with minors because they alone bear many of the consequences of pregnancy in a way that men didn't. And the dissenters in that case made the argument that California ought to have had to show as an empirical matter that that was true because there were a handful of states, maybe six, that had a sex-neutral statutory rape law. And the dissenters said, well, you could go and look and see if this actually reduced teenage pregnancy. But here you had evidence, the state put on evidence and the plaintiffs put on evidence and it involved medical testimony. And so you're saying that the district court was not to make its conclusion on which medical experts were credible and which were not in its effort to determine whether this was substantially related to, which I think everyone agrees was a legitimate and important governmental interest. So our position is that when a district court is determining what is, whether a sex classification is substantially related to the government's objective, that does not involve as an empirical matter determining whether a legislative, a legislature's predictive judgment about the consequences in the future of medical regulation or lack thereof was correct or not. The Supreme Court hasn't had a case where it's had to, to analyze anything like that. But we think the court's decision in Michael Lemp shows that when, even under intermediate scrutiny and especially in an area like this where states ordinarily have wide ranging authority to regulate both health and safety and medical ethics, that it is not for a district court as it did here to effectively impose its own policy judgment in the place of legislatures. If I could just understand your position, you're saying that when the district court made its medical experts were credible, that was a policy choice, not a fact finding choice? So I think ultimately what the district court said is it found that there were risks and the risks such as they exist aren't largely disputed by the parties. And it looked at what the evidence is about the benefits of these procedures. And the studies that exist, the parties certainly argue what their import is. And what the district court did ultimately in determining that it thought these procedures were safe enough, that the state ought to be compelled to allow them, is it made its own assessment and predictive judgment of what risks are tolerable. And that, we think, was stepping outside of the balance of what a court is supposed to do under intermediate scrutiny. The Supreme Court has never done anything of the sort in any of its intermediate scrutiny cases. Mr. Jacobs, I have a question for you. Yes, Your Honor. Is there any limiting principle on your argument that the state may forbid parents to arrange for medical care for their children? I think so long as the state had a rational basis for doing so, then there's no problem under either the Equal Protection Clause or the Substantive Due Process Clause where it's doing what it did here and issuing a generally applicable regulation that applies to all minors. I think we would be in a different situation if the state came in and sought to override a parent's decision to forego certain treatment that was available to the parent. That would be a very different situation, and I don't think the court has to address anything about what would happen there. And I think it would probably be different if the state did keep a certain procedure on the table as an option for parents, but set up some apparatus where the state is in every individual case making a determination on behalf of a parent whether that treatment is appropriate. That might be a harder question, but I don't think the court has to address that here. It's enough to say that generally applicable regulations of pediatric medicine are not subject to any sort of heightened review under either the Equal Protection Clause or the court's Substantive Due Process Doctrine. So a legislature could identify any particular vaccine or procedure that it feels is not appropriate for a child and forbid the parents to have it administered. So long as they had a rational basis for doing so, there would not be a constitutional issue. There might be other issues, federal statutory issues at play, but as a matter of the court's Substantive Due Process Framework, that's correct, Your Honor. Counsel, I have a question for you. On the legislative justification, I want to know what's in and outside of this case. So one of the things that strikes me about this is the age cutoff, and you mentioned that earlier, that it's 18. There's a line of Supreme Court precedent under the Eighth Amendment that says adolescents under the age, minors under the age of 18 don't have fully formed brains and can't necessarily make the same decisions that adults can. I'm wondering whether any of those types of justifications are in Arkansas' law. And there's record evidence and findings to support that because the district court did say that gender identity isn't necessarily fixed until the end of puberty. So I think that, if Your Honor's question is whether that rationale was in fact a justification that the General Assembly had, I think the easiest way to look at that is what the statute did. It set an 18-year cutoff. And the age that we ordinarily in this country have is the age of majority. We place all kinds of decisions at or below 18 that we think minors aren't old enough to make, and 18 is perhaps somewhat arbitrary, but it's an arbitrary number that this country has chosen for the age of majority, and that's what the legislature did here. But the legislature didn't rely on that expressly, and there's no findings to that effect, correct? If I could briefly answer, Your Honor. Briefly. The legislature did identify the potential that minors who undergo these treatments could later desist and change their minds. And setting the age at 18, I think at least implies that there is some notion that below 18 there's perhaps a greater risk of that occurring, Your Honor. Thank you. Hold on, Mr. Jacobs, Judge Wilken has a question. Excuse me, I apologize, Your Honor. In your view, is a rational basis review an issue on appeal? Yes or no? I didn't take the district court's opinion to say that the law lacks a rational basis, Your Honor. That's not the question. I'm afraid I didn't understand the question. I apologize. Is it an issue on appeal? If a majority of the court thinks the statute lacks rational basis, is that open? Our argument is certainly that the statute has a rational basis. I know what your argument is. I'm not trying to prolong the argument. I just want an answer to the question. Is that before us on appeal? I certainly think the court could say that the rational basis review applies. You don't have an answer. I apologize, Your Honor. I don't believe I understood the question. Thank you. All right, Mr. Strangiel, we'll hear from you. Good morning, Your Honor. Excuse me. Good morning, Your Honors. May it please the court. Arkansas' law subjects adolescents to disparate treatment based on their sex. I want to first address the law's sex classifications and then address the application of heightened scrutiny. By the statute's plain text, it hinges its prohibition on whether treatment departs from what is deemed typical of an individual's birth sex. In VMI, the Supreme Court instructed that heightened scrutiny is warranted when the government engages in line drawing based on what is typically male or typically female. That is precisely what this law does. Though individuals with a birth sex of female typically live and identify as women and girls, transgender boys like plaintiffs Dylan Brandt and Parker Saxton do not. The purpose of heightened scrutiny is to ensure that overbroad generalizations about how most men and women are aren't used to discriminate against those that fall outside the average description. So addressing my friend's argument about the reasons why this law wouldn't be subjected to heightened scrutiny, I want to turn to Bostock. In Bostock, the Supreme Court told us that line drawing based on the fact that a person had one sex at birth and has a different sex today is line drawing based on sex. That logic-based reasoning applies with equal force here. And the statute explicitly hinges its prohibition on gender transition, which it defines as living and identifying as one sex to living and identifying as another sex, having one sex at birth and a different sex today. Could I ask you a question? I wanted to ask a question based on what I asked to opposing counsel, which is the age cutoff. I think the age cutoff may be significant and certainly opposing counsel relied on it. And I just wonder whether that makes a difference on the justification side for the law in the sense that, and what you make of the district court's findings that, in fact, and I think there was one expert that supported this, that gender identity is not fully fixed until the end of puberty, which for many adolescents is 16, 17, 18 years old. And you mentioned the Eighth Amendment. I'm just wondering how all of this fits in and whether that's finding by the district court actually harms your case. I think the relevant finding from the district court was that once an adolescent reaches puberty, it is rare that their understanding of their gender identity chain would change. And so that finding is relevant because none of the treatments at issuing this case are prescribed until the onset of puberty. And that is the relevant set of factual findings. And as my friend said, they're not contesting those factual findings. And going to the question of how heightened scrutiny is applied, the district court applied the longstanding heightened scrutiny test. It wasn't about weighing policy judgments. The question was, could the government justify its sex-based line drawing? And the fact of- I gotta ask a follow-up, but suppose that the finding, I don't know that the findings were as clear as you say, but let's presume that the findings sort of suggested otherwise. Say it said, 50% of adolescents go back to their original gender at birth by the time they're 18. At that point, wouldn't there be both a rational basis and probably a substantial relation for the state to come in and say, well, in light of those numbers, clearly we shouldn't be engaging in some of these treatments that could cause permanent changes to one's body? Yes, if the record looked fundamentally different than the record we have, I think the state would have had an easier time carrying its burden showing that this loss substantially advances an important governmental interest. What the record did show was that rates of regret were extremely rare and that they weren't unique to this medical treatment. And coming back to the question of risk, which I think is related to your honor's question. The fact that this medical treatment carries risk doesn't explain the sex-based line that the government has drawn. All medical treatment carries risk, and the district court found that the risks of this treatment are not categorically different than the risks of many other forms of pediatric medicine that parents routinely consent to on behalf of their children. And I think importantly, the court also found that the risks as to each individual treatment were different, and yet the thing that united all of the prohibitions were whether they were based on gender transition. And as to each treatment, they carried different risks as the district court found, none of which were unique to this set of medical procedures that are categorically banned under this statute. And referring to my friend's reference to fertility, the district court found that for the treatments that affect fertility, which are not all the treatments prohibited, are also not the only pediatric treatments that could have an impact on fertility. So that also doesn't explain this sex-based line drawing. And to return to the step one question about the nature of the classification and the question of Godoldig and Dobbs, the defendants have argued that heightened scrutiny is foreclosed by the Supreme Court's decision in Godoldig and Dobbs, and I think that's wrong. In Godoldig, the Supreme Court said the government cannot deny benefits based on the fact that someone is a man or someone is a woman, but determined that denying benefits based on pregnancy is not the same as denying benefits because someone is a woman. This statute does what Godoldig says triggers heightened scrutiny. In each application, it denies benefits based on someone's birth sex and whether the treatment is deemed typical of that birth sex. Multiple times, my friend stood up here and referred to this law as a medical regulation that classifies on the basis of sex. It is almost impossible to recognize it as anything other than that. And then as to the question of whether there is other language in the paragraph in Dobbs that refers to equal protection that forecloses heightened scrutiny, that argument fails too. And the language that defendants point to is that medical treatment that only one sex can undergo does not trigger heightened scrutiny. And again, this was in the discussion of Godoldig. But the only way they can try to make that argument work here is to say, a person with a birth sex of female is the only sex that takes testosterone for the purposes of gender transition. Counsel, let me ask you about your terminology. You're using birth sex throughout your brief and again today. You've referred to an individual's sex as something that is, quote, assigned at birth rather than as a biological characteristic. On the other hand, you argue that gender identity is something a person cannot control or voluntarily change. And you argue on page 39 of your brief that it's an immutable characteristic. Do you see the inconsistency between those positions? No, Your Honor. I think there are a series of characteristics that have biological basis and many of those are physiological sex characteristics. So we would not say that there is no such thing as a set of biological sex characteristics, one of which is gender identity. But the way in which the law refers to and defines biological sex is limiting. And so for purposes of capturing the full range of sex characteristics at various points in the record, we refer to it at birth sex. But I'm happy to refer to it as biological sex because it just reinforces still that this is a law that hinges its prohibition on biological sex, which is still a sex classification. It still requires the application of heightened scrutiny, which brings us to the record. And if I could distinguish this case from the 6th and 11th circuits, this is the only case that comes before Your Honors on a full trial record. And when the case was sent back after the denial of en banc on the PI, there was a question about returning to the court with a full record. We had a long period of discovery, we had a two-week trial, and that record showed that the government's claimed justifications for this law were not borne out by a substantial trial of record evidence. And the difference between the 6th circuit and this case is that when the district, when the circuits applied rational basis in both the 6th and the 11th, they presumed certain things about the medical care that are not supported by the record in this case. And I want to briefly address the parental rights claim that Your Honor was discussing, because that is an independent basis by which this law triggers heightened scrutiny. There is not, to my knowledge, a single other medical treatment that Arkansas bans for minors that is legal and available for adults. Arkansas recognizes that adults can weigh the risks and benefits of this treatment and make decisions about whether or not to consent to it. And usually it is the role of parents to weigh those risks and on behalf of their minor children. Arkansas has come in and supplanted the judgment of parents with respect to this medical care alone, and this court and the Supreme Court have long recognized the importance of parental rights, including with the ability of parents to direct the medical care of their minor children. This is a unique law that infringes and burdens that long-standing right. It tells loving parents, like Aaron Jenen, who watched his daughter, Sabrina, suffer, that he could not listen to the doctors who were recommending medical interventions for her. Arkansas believed that this government knew better than the loving parents in this case about what was best for their minor children. That burdens that long-standing right of parents to direct the medical care of their minor children. And the state accuses the district court of applying a novel test for heightened scrutiny, but the district court applied the long-standing test that asks whether or not the means chosen by the government substantially advance and end. And in their briefing, they claim that the means chosen substantially advance the government's interest in banning gender transition procedures. But that is precisely the type of circular reasoning that the Supreme Court rejected in VMI. In VMI, Virginia claimed that excluding women from the military institute was related to their interest in single-sex education. And the court said that bent and bowed the heightened scrutiny test. There has to be an independent and important governmental interest. The interest that the state has put forth is protecting children. The substantial and extensive trial record before your honors in this case shows that this law does just the opposite. The district court found that the banned medical treatment improves health. And that this has been shown through decades of clinical experience and scientific research. The court found, as I mentioned earlier, that the risks associated with this treatment are not categorically different than the risks associated with many other forms of medical care that parents routinely consent to. And that the evidence of efficacy supporting this care is comparable to the level of evidence supporting many other forms of pediatric medicine. Counsel, I want to ask you, just because, and I'm going to use an example that is far afield, but I just want to know the answer to this. Which is, when you're talking about the TRAXL claim, the care custody of children, I think Craig versus Bourne, which is the alcohol case. So I wonder if parents said, I want to know how far this goes. If parents said, you know what, I really want my kids to be able to drink alcohol, to buy alcohol, and if the state has a law banning alcohol, that interferes with my care and custody of my children because I want them to have access to alcohol. Now I understand that's different in kind, different in type. But I wonder how far your proposed rule goes, and why are medical treatments different than a parent who wants their kid to have alcohol or some other thing? I think because of the way the right, at least as to medical care, has been outlined by the Supreme Court in Parliament, which is the right to direct the medical care of one's minor child, subject to the independent recommendations of a medical professional, that that right has been circumscribed by the Supreme Court. And applying that right here would not go so far as to apply to a claim with respect to alcohol. And just, I see I'm almost out of time, and I do want to just reference one final finding of the district court, which is that ultimately the court concluded that this is a law that harms children, and that it doesn't advance the claimed interest in protecting them. It actually undermines it. And even the state's expert, Dr. Levine, testified that the effects of this law would be shocking and devastating to the adolescents who rely on this care, and he went so far as to predict that doctors would find their way around it. Unless your honors have any other questions, we respectfully ask that you affirm the district court's injunction. Thank you. Very well, thank you for your argument. Ms. Schwabauer, we'll hear from you. May it please the court, Barbara Schwabauer on behalf of the United States as amicus. I'm happy to answer any of the court's questions, but I want to start by explaining why Act 626 classifies based on sex when the statutory text is the focus of the inquiry, and by relying on longstanding principles of equal protection. As the court found in the first case, the preliminary injunction case, the Act's text explicitly conditions access to medical care on a minor sex, as defined under the Act, as to whether or not they can get certain prescribed medications and hospital services. And indeed, it also encapsulates gender nonconformity in the text by saying that those treatments cannot be reached unless they are, if they are altering or removing characteristics typical for the individual, or instilling or creating characteristics that are different from the individual. So this law defines the access to care based on sex, as well as gender nonconformity. Now the state asks you to set aside this straightforward conclusion about the text and follow a path to rational basis scrutiny rooted neither in the statutory text nor in traditional principles of equal protection. First, the state has argued that Act 626 does not classify based on sex at all, because any sex-based classification is premised on, quote, biological reality. But physical differences between sexes play no role in determining whether there is a sex-based classification. Indeed, the entire purpose of intermediate scrutiny, as we know from the VMI case, is to account for the fact that there may be, quote, enduring physical differences. And that is to distinguish it from the purported inherent differences that are inappropriate to use in the race-based classification context. So the standard of intermediate scrutiny distinguishes the standard for justifying a sex-based classification from a race-based classification. So physical differences cannot enter the analysis at the classification stage. There would be no need for intermediate scrutiny if sex-based distinctions premised on physical differences did not count as sex-based classifications at all. And that's for this reason the panel in the prior decision found that this And asserted reliance on these types of differences is the exact type of assertion that intermediate scrutiny was made to test. In addition, the state argues that Act 626 applies equally to minors on the basis of sex. But to reach that conclusion stretches the concept of equal application so broadly that it is essentially rigged. It's based on the idea that no male or female adolescent can obtain, quote, gender transition procedures. But that framing takes the sex-based classification into account in describing the benefit being denied and then looks for a sex-based classification. So, of course, none can be found. And that can't be right. You could erase any sex-based or race-based classification using that framework. Take VMI. It's not that women were prohibited from entering VMI. It's that no man or woman can attend a coeducational military officer school in the state of Virginia or Loving versus Virginia. No person, white or black, can have an interracial marriage. That simply can't be right. The Supreme Court has rejected that logic again and again. We have to look at how the law applies to the individual because the central tenet of the Equal Protection Clause is that it is an individual right. We do not deny to any person the equal protection of laws. Finally, the state asks you to apply rational basis scrutiny because the ban in Act 626 is equivalent to the ban of abortion for purposes of equal protection. And the Supreme Court has held that any law that bans abortion does not inherently classify on the basis of sex because there is no person other than a female assigned at birth who can have an abortion. So an abortion ban cannot distinguish between men and women and the procedure of abortion. That is simply not true here. The words sex in this statute, the words male and female in this statute are doing work to draw lines because a male or female adolescent, a cisgender or transgender adolescent can undergo the medical procedures at issue here. They can each take testosterone, puberty blockers, estrogen, and have a medically intended effect. I see that my time is almost up. If there are no further questions, the United States asks that this Court affirm the district court's holding that Act 626 violates the Equal Protection Clause. Very well. Thank you for your argument. I believe, Mr. Jacobs, you- I believe my time expired, Your Honor. Yes, it did. If the Court has any questions, I'm happy to answer them, but otherwise- Very well. We'll take the case as submitted then. Thank you to all counsel. The Court will file a decision in due course. That concludes the argument session for this morning. The Court will be in recess until further call of the docket.